```
                   UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF IOWA


IN RE:                         )
                               )       Chapter 7
TICHY ELECTRIC COMPANY,        )
INC.                           )
                               )       Bankruptcy No. 05-00453
       Debtor.                 )
```

**ORDER RE: MOTION TO DISMISS**

This matter came before the undersigned on September 7, 2005 pursuant to assignment. Debtor Tichy Electric Company was represented by attorney John Titler. The Petitioning Creditors ("Creditors") were represented by Attorney Joe Peiffer. After the presentation of evidence and argument, the Court took the matter under advisement. The time for filing briefs has now passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

**STATEMENT OF THE CASE**

Creditors filed an involuntary Chapter 7 petition against Tichy Electric Co. A month later, Creditors filed a Motion to Dismiss based on a payment they received from Tichy Electric. The Court set the Motion to Dismiss for evidentiary hearing to consider the propriety of this involuntary bankruptcy filing.

**BACKGROUND**

On February 10, 2005, the Cedar Rapids Electrical Workers Health & Welfare Fund, IBEW Local 405 Retirement Savings Fund ("Retirement Fund"), and Cedar Rapids Electrical Apprenticeship Training and Education Trust ("Education Fund") (collectively known as "the Funds") filed an involuntary Chapter 7 petition against Debtor Tichy Electric Company. The petition asserts these entities hold claims against Debtor totaling $39,810.04 as follows: (1) an $18,740.73 claim for contributions to the Health & Welfare Fund; (2) a $19,177.51 claim by the Retirement Fund for delinquent contributions; and (3) a $1,892.23 claim for delinquent contributions to the Education Fund. John Negro signed the involuntary petition as Trustee on behalf of both the Health & Welfare Fund and the Retirement Fund. Charles Swore signed as Trustee on behalf of the Education Fund. All three Funds are represented by Attorney Joe Day of the law firm of Day Rettig Peiffer, P.C.

On March 10, 2005, Creditors filed a Motion to Dismiss. The Motion states that Debtor has "tendered payment sufficient to satisfy all claims owed to the Petitioning Creditors." The U.S. Trustee resisted the Petitioning Creditors' Motion, arguing that, pursuant to § 303(j)(1), this case could only be properly dismissed after notice and hearing.

The Court conducted a hearing on the Motion on April 5, 2005. On April 6, 2005, the Court issued an Order establishing deadlines for filing a schedule of creditors, providing notice to all creditors of the Motion to Dismiss, and conducting a final hearing on the Motion. In response to this order, Tichy Electric filed a list of creditors and their addresses, disclosing more than 12 creditors, not including the Funds.

After a scheduling hearing, the Court entered an order on May 26, 2005 finding that a full evidentiary hearing should be held and setting out the issues to be addressed, as follows:

> 1. At whose behest the decision was made to use the bankruptcy process in this case.
>
> 2. What the intent of the petitioning creditors was and what their understanding was of the ultimate goal of this petition.
>
> 3. What form of due diligence was utilized by counsel and the parties in making a determination as to whether the statutory requirements for an involuntary petition were satisfied or could be satisfied at an evidentiary hearing.
>
> 4. Whether the Petitioning Creditors are, in reality, separate entities entitled to file or whether it is in fact a single entity.
>
> 5. How and under what conditions the underlying dispute was settled precipitating the Motion to Dismiss.
>
> 6. Why the settlement occurred and what were the intentions of the parties when this happened.

### FINDINGS OF FACT

The three Funds which signed the petition as Creditors were all created by a collective bargaining agreement between

2

the electrical workers union, IBEW, and local contractors. Under the agreement, separate trusts were created for the Health & Welfare Fund, the Retirement Fund and the Education Fund.  Each of these Funds is recognized by the IRS as a separate tax-exempt trust.  Moneys administered by each trust are recognized as separate employee benefit funds under ERISA.

The Trustees for the funds include equal numbers of union representatives and contractor employers.  At the time of the filing of the petition, the Health & Welfare Fund and the Retirement Fund had identical trustees.  At least two of these trustees are also trustees of the Education Fund.

Employers such as Tichy Electric are obligated to report employee hours and make contributions to the Funds as required by the IBEW collective bargaining agreement.  Employers submit their reports and one check to pay all amounts due to a bank with a copy of the report going to a third-party administrator.  The bank then separates out the amounts to be paid to each fund.  If an employer pays less than the amount owed, each fund takes a pro rata percentage of the payment pursuant to an over/under agreement between the funds.

A third-party administrator oversees the contributions. As a standard practice, the administrator reports to the Trustees within 30 days when an employer becomes delinquent in payments.  Because of a recent change of administrators, Tichy Electric's delinquencies were not reported to the Trustees for three to four months.  Tichy Electric became delinquent in July or August and the Trustees were not notified until late November 2004.  The Trustees then notified the Funds' attorney, Joe Day.  He testified that as attorney for the Trustees of the funds, he was responsible for collection of delinquent contributions.

The Trustees become concerned when an employer is delinquent because they could be personally liable for the delinquencies if they do not take action to collect from the employer.  Mr. Day testified that ERISA prohibits the Funds from extending credit to parties-in-interest, such as the contractor employers.  If the Trustees fail to collect delinquencies, it could be construed as a prohibited loan to the employer.  The Trustees were also concerned that Tichy's failure to pay the Health & Welfare Fund amounts due could result in workers losing their health insurance coverage.  In this case, the Trustees were especially concerned because Tichy Electric had become several months delinquent before the

3

Trustees were informed due to the change to a new third-party administrator.

Attorney Day testified that he met with Jerry Tichy, officer and president of Tichy Electric, and his son Darren Tichy around Thanksgiving 2004.[1] Mr. Tichy told Mr. Day that collections had been slow and the business was in a precarious position financially. They discussed the possibility that amounts due could be reduced by subtracting overpayments made based on the fact that Darren Tichy moved from union employment to office employment. They also considered the possibility that Darren Tichy could withdraw his accumulated pension funds to help pay down the company's delinquencies. By early February, it became apparent that Darren could not cash in his pension account because he had recently married and needed, but could not obtain, the approval of his wife. A total of approximately $20,000 was owed to the three funds for delinquencies between August and November 2004. Additionally, Tichy Electric was incurring penalties of $50 per day.

John Negro is a Trustee for each of the three funds. He testified he learned in November 2004 of Tichy's delinquencies. He talked to Jerry Tichy who told him "in a roundabout way" the company was having problems with collections and billings.[2] Mr. Negro stated that he knew that Tichy was on thin ice with suppliers. Because Tichy was on a C.O.D. basis with suppliers, it was "public knowledge" that the company was not punctually paying its bills. The bookkeeper for Tichy Electric, who has since been replaced, was not billing customers or pursuing collections as needed.

Attorney Joe Day discussed with the Funds' Trustees how to deal with Tichy Electric's contribution delinquencies.[3] He

---

[1]Although the Petitioning Creditors' Brief states Jerry Tichy and Joe Day met two to three times, the record reflects only this single meeting.

[2]The Petitioning Creditors' Brief states that "Jerry Tichy contacted John Negro and Chuck Swore on virtually a daily basis" to see how to work out the delinquency, Brief at p. 2, and that John Negro and Chuck Swore "spoke with Jerry Tichy on repeated occasions", Brief at p. 15. These assertions do not exist in the evidentiary record.

[3]In the record, there is some testimony regarding a meeting between Mr. Day and the Trustees of the Funds to discuss how to attempt to collect the sums owed by Tichy

4

testified that U.S. District Court has exclusive jurisdiction over collection actions for these types of employee benefit plans.  Thus, the Funds were precluded from utilizing Iowa small claims court.  Mr. Day became aware of the option of filing an involuntary bankruptcy petition at an employee benefits seminar put on by the ABA.  He heard at the seminar that bankruptcy could be a better option if the employer company is in difficult financial condition and at least three creditors joined in an involuntary bankruptcy petition.

Mr. Day talked to his law partner, attorney Joe Peiffer, to discuss the requirements of filing an involuntary bankruptcy petition against Tichy Electric.  Mr. Day testified that he believed proceeding with the bankruptcy filing would be better because it would freeze additional accrual of liability.  Because the Funds were employee benefit funds, they would be in better position in bankruptcy as priority creditors.  He also testified that, if the Funds went to District Court, there would likely be a delay of 16 to 24 months.  Mr. Day was involved in a recent case in District Court which was not resolved for 38 months.  As the Funds' Trustees had given Mr. Day discretion to proceed as he saw fit, he enlisted the assistance of Mr. Peiffer to file the involuntary bankruptcy petition.

Mr. Day testified that the purpose of the bankruptcy action was to collect the delinquent contributions from Tichy Electric.  Mr. Day, Mr. Negro and Chuck Swore, also a Trustee for the Funds, all testified that they never intended to put Tichy Electric out of business.  They all testified that by filing the involuntary petition, they sought to collect from Tichy the amounts due to the Funds.  Mr. Day testified that he had pursued similar collections in U.S. District Court probably 20 to 25 times over the years.  He stated that these cases had never been successful in getting a dime from a contractor who owed this much money.  Mr. Negro testified that the bankruptcy petition was filed as the fastest and most economical way to collect from Tichy Electric.  Mr. Swore testified that the reason the bankruptcy petition was filed

---

Electric.  The option of filing an involuntary bankruptcy petition was discussed and Mr. Day was given discretion in deciding how to proceed.  On pages 3 and 4 of the Creditors' Brief, they set out as facts significant information which is not included in the record.  This includes statements regarding a $15,000 bond, litigation with DuBall Electric and occurrences ten and fifteen years ago.  None of these matters are evident in the record.

5

was to recover amounts owed to the funds and protect the funds' interests.  Mr. Swore answered a question by Debtor's attorney, John Titler, as follows:

> Q    Did anyone tell you how you were going to collect those funds without putting Tichy Electric out of business if you filed an involuntary Chapter 7?
>
> A    I don't know that anyone told me.  I felt that there would be some level of negotiations giving Jerry [Tichy] the opportunity to – to make the contributions.

Transcript, p. 89, lines 11-16.

Attorney Joe Peiffer testified he did not "in my wildest dreams" anticipate that Tichy Electric would respond to the involuntary petition by tendering payment to settle the debt owed to the Funds.  He stated he expected the case would be administered as a Chapter 7 case or converted to Chapter 11.  Mr. Peiffer testified that he believed there were advantages to filing the involuntary bankruptcy petition including the appointment of a Chapter 7 trustee, the requirement that the debtor assume and cure or reject the collective bargaining agreement which would limit ongoing liability to the Funds, and the Funds' priority status under § 507(a)(4) as employee benefit plans.  He stated he discussed the situation with Mr. Day to determine whether there were three creditors with claims to file the petition, the claims exceeded the jurisdictional limit and Tichy Electric was not paying its debts as they became due.  Mr. Peiffer testified that along with the Funds' wish to collect on the debt, the bankruptcy petition was also filed in order to take advantage of the priority position allowed by § 507(a)(4) and to stop the continuing accrual of liability.

Attorney Day provided the information he had obtained from the Funds and Mr. Tichy to Attorney Peiffer, who filed the involuntary petition because he had the capability of filing electronically.  The petition was filed on February 10, 2005.  Neither the Trustees nor Mr. Day sought information regarding Tichy Electric's financial circumstances other than discussions with Jerry Tichy.  Postpetition, Mr. Day went on vacation for a time but also stayed in contact with Jerry Tichy.  In an email dated February 24, 2005, Exhibit 13, Mr. Day discusses the calculations of Tichy Electric's delinquent contributions.  It closes as follows: "If the total is paid

6

within 30 days of the Bankruptcy filing we can dismiss the Bankruptcy proceeding otherwise not." Mr. Day testified that the seminar he attended indicated this is correct law. He assumed there was some jurisdictional issue regarding the first 30 days of an involuntary bankruptcy case. He now knows that was not good information. Attorney Peiffer testified he is not familiar with any law which provides for dismissal as set out in the email. He stated he was not consulted by Mr. Day concerning the email.

Mr. Tichy testified he understood from Mr. Day that if he paid the delinquencies within 30 days everything would be fixed and the bankruptcy would go away. He borrowed money from a private source, giving a personal note, and, on March 3, 2005, paid $26,000 to the Day Rettig Peiffer Clients Trust Account to settle the Funds' claims. This payment covered the amounts of the delinquent contributions and the Funds agreed to waive the penalties imposed. Mr. Tichy agreed to pay Mr. Day's attorney fees in the amount of $1,500, over time. He insisted that the bankruptcy case be dismissed in exchange for this payment and promised not to become delinquent in contributions in the future. Mr. Day testified that he told Mr. Tichy he would do whatever he could to get the bankruptcy case dismissed.

Tichy Electric was not represented by counsel prior to the time the involuntary petition was filed. Between the time Mr. Tichy got notice of the involuntary petition and when he paid over the $26,000, he met with Attorney John Titler on approximately February 28, 2005. Mr. Titler knew Mr. Tichy was trying to settle with the Fund by paying amounts due and avoid the need to file an answer to the petition.[4]

On March 23, 2005, the Day Rettig Peiffer law firm wrote two checks in the amounts of $23,546.58 to Auxiant Inc. and $2,453.42 to Neca. The check to Auxiant, paying Tichy's delinquent contributions to the Health & Welfare Fund and the Retirement Fund, was cashed. The check to Neca for Tichy's debt to the Education Fund was not cashed and was subsequently

---

[4]The Petitioning Creditors' Brief states: "Approximately the same time that Tichy tendered the funds, attorney Joseph Peiffer received a call from attorney, John Titler, on behalf of Tichy Electric, requesting a dismissal of the case." This is not supported by the record. Rather, Mr. Day testified that Mr. Peiffer got Mr. Titler on the phone and "said, you know, can we dismiss this thing? Mr. Titler says, well, I think so." Transcript at p. 36, lines 19-24.

7

voided.  The law firm did not seek or obtain approval from the Court to make these distributions.  Mr. Day testified that he made these payments on his own and did not consult with Mr. Peiffer, who was out of the office at the time.  He stated that Mr. Peiffer "chewed his butt when he got back" but he did not realize it was not appropriate to distribute the funds.  Mr. Day testified that as the Trustees of the Funds had turned over decisions regarding collections to him, he make the judgment to accept the payment from Mr. Tichy.

### ARGUMENTS OF THE PARTIES

The Funds argue that they are three separate entities owed more than $12,300, satisfying the § 303(b)(1) requirements.  They assert they filed the involuntary petition in good faith for proper purposes.  The Funds assert Debtor has not met its burden to rebut the presumption that the petition was filed in good faith.  They argue that Debtor has waived any right to damages by consenting to dismissal of the petition.

Debtor argues this filing was made for an improper and inappropriate purpose.  It asserts the case should be dismissed for bad faith but the Funds should be ordered to pay damages to Debtor and its counsel.  Debtor argues the Funds are actually one entity or hold only one claim, in violation of the requirement that the involuntary petition be filed by three separate entities.

### CONCLUSIONS OF LAW

To be eligible to file an involuntary petition in bankruptcy, the creditor must be the holder of claim against the debtor that is not contingent or subject to a bona fide dispute. In re ELRS Loss Mitigation, LLC, 325 B.R. 604, 609-10 (Bankr. N.D. Okla. 2005); 11 U.S.C. § 303(b).  The bankruptcy court enters an order for relief in an involuntary proceeding if it finds that the debtor is generally not paying its debts as they become due.  11 U.S.C. § 303(h).  The burden of proof lies with the petitioning creditors to establish that their claims are not subject to a bona fide dispute and that the debtor is not paying debts as they become due.  ELRS Loss, 325 B.R. at 610; In re Rimell, 946 F.2d 1363, 1364 (8th Cir. 1991).

There is a presumption that petitioning creditors under § 303 act in good faith. In re Eberhart Moving & Storage, Ltd., 120 B.R. 121, 123 (Bankr. D.N.D. 1990), citing Basin

8

Elec. Power Coop. v. Midwest Processing Co., 769 F.2d 483, 486 (8th Cir. 1985) (noting in an involuntary case that the burden is on the party opposing the petition to show bad faith). Thus, the alleged debtor has the burden of proving bad faith by a preponderance of the evidence. In re Bayshore Wire Prods. Corp., 209 F.3d 100, 105 (2d Cir. 2000); In re Smith, 243 B.R. 169, 194 (Bankr. N.D. Ga. 1999).  Also, the burden is on the alleged Debtor to establish the nature and the extent of its damages. In re Mundo Custom Homes, Inc., 179 B.R. 566, 569 (Bankr. N.D. Ill. 1995).

The goal or purpose of an involuntary filing should be the equal distribution of assets among creditors. In re Smith, 243 B.R. 169, 174 (Bankr. N.D. Ga. 1999).  "The filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." In re Reid, 773 F.2d 945, 946 (7th Cir. 1985).

> The danger of involuntary bankruptcy cannot be overlooked by the courts.  An allegation of bankruptcy is a charge that ought not be made lightly.  It usually chills the alleged debtor's credit and his source of supply.  It can scare away customers.  It leaves a permanent scar even if promptly dismissed.  It is also obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this court.

In re Dino's, Inc., 183 B.R. 779, 783-84 (S.D. Ohio 1995).

### REQUIREMENT OF THREE PETITIONING CREDITORS

Section 303(b) provides that an involuntary case is commenced by filing a petition:

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $12,300 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and

9

>   any transferee that is voidable . . . , by one or more of such holders that hold in the aggregate at least $12,300 of such claims . . . .

11 U.S.C. § 303(b). "The purpose of requiring at least three creditors to launch an involuntary case (where the debtor has 12 or more creditors) is to necessitate some joint effort between creditors." In re Iowa Coal Mining Co., 242 B.R. 661, 670 (Bankr. S.D. Iowa 1999). In Iowa Coal, the court concluded that the relationships of the petitioning creditors were so intertwined that it would be unfair to attempt to disentangle them to meet § 303(b) requirements. Id. Generally, joint holders of an obligation are counted as one creditor. In re Moss, 249 B.R. 411, 421 n.7 (Bankr. N.D. Tex. 2000).

Although not cited by the Funds, the Court is aware of two cases considering the separate creditor requirement as it relates to three union funds filing an involuntary case against a contractor. In re Mid-America Indus., Inc., 236 B.R. 640 (Bankr. N.D. Ill. 1999); In re Richard A. Turner Co., 209 B.R. 177 (Bankr. D. Mass. 1997). Both courts noted that § 303(b)(1) requires that when a debtor has twelve or more creditors, an involuntary case may be commenced only by three or more entities and each entity must be the holder of a claim against the debtor. MidAmerica Indus., 236 B.R. at 644; Turner Co., 209 B.R. at 178. They concluded that the union funds were separate entities holding separate claims even though the claims had been reduced to single judgments. Mid-America Indus., 236 B.R. at 646; Turner Co., 209 B.R. at 180.

### BAD FAITH

Although the Bankruptcy Code does not explicitly require that a bankruptcy petition be filed in good faith, the Eighth Circuit has found that the Code contains an implicit good faith requirement. In re Bock Transp., Inc., 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005); In re Cedar Shore Resort, Inc., 235 F.3d 375, 379 (8th Cir. 2000). A bad faith filing can be cause for the dismissal of a petition. Basin Elec. Power Coop. v. Midwest Processing Co., 769 F.2d 483, 486 (8th Cir. 1985). The filing of an involuntary petition for a non-bankruptcy purpose is evidence of bad faith. Id.; Bock Transp., 327 B.R. at 382.

The standard for bad faith is not defined in the bankruptcy code. In re Cannon Express Corp., 280 B.R. 450, 453 (Bankr. W.D. Ark. 2002). The determination of whether

10

petitioners acted in bad faith is a question of fact.  Id. Courts have developed the following tests to make such a determination:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum.
>
> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition.  Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor.
>
> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;
>
> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and
>
> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).

Id. (citing Landmark Distrib., 189 B.R. at 309-10).

One court noted that the objective prong of the inquiry requires the debtor to prove that the petitioning creditors did not conduct a reasonable inquiry into the law and the facts surrounding the case prior to the filing.  Dino's, Inc., 183 B.R. at 783.  The subjective aspect of the bad faith inquiry requires the debtor to prove that the petitioning creditor filed the petition to achieve an improper purpose. Id.

11

The court in <u>Cannon Express</u>, considered the following factors in order to examine thoroughly whether the involuntary petition was filed in bad faith:

> whether the petition's allegations were well grounded in fact; whether Petitioners could have advanced their own interests in a different forum; whether Petitioners used the involuntary bankruptcy proceedings to obtain a disproportionate advantage over other creditors; whether the petition was motivated by an improper purpose, such as ill will, malice, or harassment; and whether a reasonable person would have initiated the petition under the same circumstances.

280 B.R. at 545.

Several courts hold that debt collection is an improper purpose for filing an involuntary petition under § 303. <u>See e.g.</u>, <u>Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.</u>, 986 F.2d 709, 716 n.11 (4th Cir. 1993); <u>Dino's Inc.</u>, 183 B.R. at 783. "The Bankruptcy Code was not intended to permit a single creditor who is owed a relatively small debt to put a debtor into involuntary bankruptcy, negotiate a settlement and walk away." <u>In re Grossinger</u>, 268 B.R. 386, 389 (Bankr. S.D.N.Y. 2001). Bad faith has been found to exist when a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures. <u>In re Smith</u>, 243 B.R. 169, 199 (Bankr. N.D. Ga. 1999). The 8th Circuit has stated that "[a] creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt." <u>In re Nordbrock</u>, 772 F.2d 397, 400 (8th Cir. 1985). The remedy of involuntary bankruptcy was not intended to be a substitute for ordinary debt collection procedures. <u>In re Whiteside</u>, 240 B.R. 762, 766 (Bankr. W.D. Mo. 1999).

**DAMAGES**

Petitioning creditors assume certain risks when filing an involuntary bankruptcy petition. <u>In re Val W. Poterek & Sons, Inc.</u>, 169 B.R. 896, 905 (Bankr. N.D. Ill. 1994). If the petition is dismissed, the Court may grant judgment against the petitioners for fees, costs and damages under § 303(i), which states as follows:

> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the

12

>  right to judgment under this subsection, the court
>  may grant judgment --
>
>  >  (1) against the petitioners and in favor of the
>  >  debtor for --
>  >
>  >  >  (A) costs; or
>  >  >
>  >  >  (B) a reasonable attorney's fee; or
>  >
>  >  (2) against any petitioner that filed the
>  >  petition in bad faith, for --
>  >
>  >  >  (A) any damages proximately caused by such
>  >  >  filing; or
>  >  >
>  >  >  (B) punitive damages.

11 U.S.C.A. § 303.  Under § 303(i)(1), the award of attorney's fees and costs does not require a finding of bad faith and is intended to reimburse the debtor for expenses necessarily incurred in defending an involuntary petition.  Cannon Express, 280 B.R. at 452.  In order to recover actual or punitive damages under § 303(i)(2), the debtor must show that the petition was filed in bad faith.  Id.  The awarding of fees, costs and damages is not automatic, but is committed to the sound discretion of the court.  Poterek & Sons, 169 B.R. at 905; Iowa Coal, 242 B.R. at 673.

An award of compensatory damages can include remuneration for present and future lost sales, loss of goodwill, and increased credit and bank costs.  Cannon Express Corp., 280 B.R. at 457-60.  Other compensable losses can include bank charges, interest, and litigation costs.  See Poterek & Sons, 169 B.R. at 905-06.

"Punitive damages can be awarded when there is a showing that the petitioning creditors filed the involuntary petition without just cause or excuse, and to punish the wrongdoers and deter similar conduct in the future."  Cannon Express Corp., 280 B.R. at 462.  If an award for punitive damages is warranted, the amount of the award must be "carefully tailored" in light of other damages and fees awarded in the case.  Id.

13

**CONSENT OF THE DEBTOR**

The Funds cite In re R. Eric Peterson Constr. Co., 951 F.2d 1175, 1179 (10th Cir. 1991), for the proposition that Tichy Electric is not entitled to fees, costs or damages because it has consented to dismissal. Section 303(i) allows the court to assess fees, costs and damages against the petitioners "[i]f the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection." Debtor argues in its brief that although it wishes to have the case dismissed, the Court should award fees, costs and damages under § 303(i).

This case is similar to the case cited above. In R. Eric Peterson Constr., the court noted that dismissal was sought under § 303(j)(1), "on the motion of the petitioner", rather than under § 303(j)(2), "on the consent of all petitioners and the debtor." 951 F.2d at 1177 n.3. On the record, the debtor indicated that it did not object to the petition being dismissed, but reserved its right to assert a claim under § 303(i). Id. The court concluded that the debtor did not consent to dismissal within the meaning of § 303(i). Id. at 1182. The court held: "Where, as here, the debtor does not affirmatively consent to dismissal and where a fair reading of the record makes it clear that the debtor intended not to waive its rights under § 303(i), the bankruptcy court may entertain a claim for damages." Id. at 1182.

**ANALYSIS**

The Funds' Motion to Dismiss raises several red flags which led to the hearing in this matter. First, the three petitioning creditors are significantly interrelated and hold identical interests. It is evident that the Funds did not pursue this involuntary filing as a joint effort of the creditor body as a whole with a goal of equal distribution of assets among creditors. No inquiry was made with any other creditors of Tichy Electric concerning the possibility of an involuntary bankruptcy petition and no creditors have responded to any filings in this case. When, as here, the Trustees in all three entities are almost, if not completely, identical, and when the interests of the signing creditors are completely identical and self-serving, a more sophisticated test to determine if they are indeed separate entities may be more appropriate. However, the legal authority found by this Court, compels the conclusion that the Funds and their claims are sufficiently separate under existing standards to satisfy

the requirement that the involuntary petition be filed by three creditors.

Having concluded that three legally distinct creditors executed the petition, the Court must examine the Petitioning Creditors' motivation in filing the petition.  In so doing, the Court is mindful that Tichy Electric bears the burden to overcome a presumption that the Funds filed the petition in good faith.  However, the evidence presented easily satisfies the limited burden of destroying this presumption.

While the Court has concluded that the three filing creditors are legally separate entities, it is nevertheless appropriate to examine their relationship in the context of their intent.  All three creditors were solely interested in collecting delinquent contributions from Tichy Electric.  Their interests were identical.  They had no interest in acting on behalf of the creditor body as a whole.  In fact, no other creditors were contacted and none have participated in this case at any stage.  The Creditors acknowledge that they were unaware that, as signatories on the petition, they assumed responsibilities separate from their own self-interest.  The Funds' Trustees all testified that their sole purpose in pursuing this petition was to collect the delinquent contributions from Tichy Electric.  In fact, once the funds were paid by Tichy Electric, they were run through counsel's trust account and disbursed without court approval.  Obviously, the Funds were not thinking of the interests of the entire creditor body when they accepted the disbursements.

Evidence was presented explaining the benefits of using the bankruptcy forum.  Mr. Day testified that filing in Bankruptcy Court would freeze accrual of Tichy's liability.  He also testified that, since these were employee benefits, they would be treated as priority creditors.  Mr. Day's partner, Mr. Peiffer, testified that the advantages of the bankruptcy forum included the appointment of a Chapter 7 trustee, the ability to force the debtor to assume or reject the collective bargaining agreement, as well as the respective funds' priority status under § 507(a)(4).

The foregoing may be reasons why a hypothetical creditor would utilize an involuntary Chapter 7 procedure.  However, these reasons are not applicable in this case.  The Trustees were consistent in their testimony that their intent was to use this forum to collect the obligation owed to them by Tichy Electric.  Appointment of a trustee and determinations relating to priorities only become relevant if a case is

15

administered to completion.  None of the signing Trustees testified that they intended to put Tichy Electric out of business.  They understood that after filing, some negotiations would occur, payments would be made, and the case dismissed.  This view is confirmed by Mr. Day's e-mail to Tichy Electric which stated that payment could be made within 30 days of filing.  Clearly, this was an attempt to collect the delinquent funds and not a sincere attempt to liquidate or reorganize this business.

Second, any discussion concerning the possible benefits of bankruptcy, other than collection of Debtor's delinquency, was exclusively between Mr. Day and Mr. Peiffer.  Nowhere does this record reveal that these matters were discussed with the signatories on the petition.  It is the intent of the petitioning creditors which is critical to this analysis.  The record shows, without contradiction, that their motivation was to collect the delinquency.  Any other considerations, since they were unknown to the signatories, are irrelevant.

The evidence reveals that the normal reasons for filing a bankruptcy petition were absent in this case.  The appropriate forum for this type of collection action is the U.S. District Court.  Mr. Day testified that he had unsuccessfully filed in District Court for many years.  He stated that the process is slow and the results have been unsatisfactory.  He suggested the bankruptcy forum to his clients because it had been suggested as an alternative at a seminar.

While the Bankruptcy Code provides a forum for debtors to protect themselves, it also provides a forum for creditors to do likewise.  The most potent remedy among them is the extraordinary power given to creditors to force an operating business into court to defend its existence through an involuntary petition.  Because this weapon is so potent, its use must be strictly monitored.  The power of an involuntary petition must be exercised for the good of the entire creditor body and for legitimate bankruptcy purposes.  It is not intended to be used in an exclusively self-serving manner as a collection device.  Even a cursory consideration of this process would reveal that the use of this option to collect individual debt is completely disproportionate to the consequences of such action.  Improperly exercised, a creditor can hold a business hostage unless its claim is satisfied.  Because of this potential for abuse, the exercise of this power must be closely scrutinized.  The use of an involuntary petition by these Creditors in this manner is precisely the type of conduct which is forbidden and is the type of conduct

which is defined as having been done in bad faith.  It is for this type of conduct that sanctions are warranted.

## SUMMARY

The Petitioning Creditors filed this petition for the sole purpose of collecting debts owed to them.  The appropriate forum for this type of action is the U.S. District Court.  These Creditors used the bankruptcy process for the improper purpose of obtaining a disproportionate advantage over all other creditors.  They were motivated by the improper purpose of using the bankruptcy process as a weapon to satisfy their claims.  These factors establish bad faith warranting sanctions.

## DAMAGES

An award of damages for costs and attorney's fees, pursuant to § 303(i)(1), is appropriate even absent a showing of bad faith.  Counsel for Debtor shall prepare a statement of costs and attorney's fees for submission to the Court no later than November 18, 2005.

Because the Court has made a finding of bad faith, Tichy Electric may also be entitled to compensatory and punitive damages pursuant to § 303(i)(2).  Ordinarily, the Court would hold a scheduling conference with the goal of setting a trial on damages.  However, the Court recognizes that, in this case, all of the individuals involved have known each other for some time.  The issues involve a long-term relationship between the IBEW union and a union contractor.  Debtor's relationship with the union long-term, may be a consideration in this case.  Because of these unusual circumstances, the Court will allow Debtor to dictate the course the Court should take in this regard.  No later than November 18, 2005, Debtor shall file with the Court a statement of its intentions regarding the assessment of actual and punitive damages.  Thereafter, the Court will schedule additional hearings as necessary.

**WHEREFORE**, this case is DISMISSED based upon a finding of bad faith.

**FURTHER**, the Court retains jurisdiction to determine awards under § 303(i)(1) and (2).

**FURTHER**, Tichy Electric is directed to file a statement of costs and fees requested under § 303(i)(1) on or before November 18, 2005.

**FURTHER**, Tichy Electric is directed to advise the Court of its intentions concerning actual and/or punitive damages under § 303(i)(2) on or before November 18, 2005.

Dated and Entered: October 31, 2005

_____
PAUL J. KILBURG
CHIEF BANKRUPTCY JUDGE